**No. 57341.**—Cleevelandt Corp. *v.* United States, protests 137550–K and 137551–K (New York).

MOLLISON, Judge: The above-entitled protests were consolidated for trial, and relate to merchandise which is described on the invoices as "billes saphir" and as "balls for stylographe." Duty was assessed thereon at the rate of 72 cents per dozen and 40 per centum ad valorem under the provision in paragraph 1550 (b) of the Tariff Act of 1930 for parts of fountain pens or stylographic pens. Although various claims were made in the protests, all were actually, or, in effect, abandoned save the claim for duty at the rate of 30 per centum ad valorem by similitude to the articles composed wholly or in chief value of earthy or mineral substances, not decorated, and not specially provided for, covered by the provisions of paragraph 214 of said act.

It was agreed between counsel at the trial that the merchandise involved is, similar in all material respects to articles composed wholly of earthy or mineral substances, not decorated in any manner, and that if the merchandise is not dutiable as classified, its correct rate of duty is 30 per centum ad valorem under paragraph 214, *supra.*

The facts, as revealed in the record, are not seriously in dispute. The president of the plaintiff corporation was the sole witness who testified. It appears that some time prior to importation of the merchandise here involved, he developed and patented a writing instrument of the nature of what is now commonly known as a "ball point" pen. Essential features of such a pen were a socket at the tip into which was to be fitted a sphere made, in the case of the pen developed by the witness, of synthetic sapphire material. The operation of the pen was intended to be such that when applied to paper and moved, as in the case of writing, the sphere would pick up ink, presumably from a reservoir connected with the socket, and distribute the ink on the paper in accordance with the writing movements.

It is clear that for proper operation of the pen the "ball point" or sphere was required to be perfectly spherical.

Prior to placing the order for the merchandise in question, the witness received samples from the manufacturer which were perfect. He then placed an order

for 50,000 synthetic sapphire spheres, 1 millimeter in diameter. Proceeding upon the assumption that merchandise which was shipped in response to that order would be in accordance with the samples and the order, the plaintiff neglected to have adequate tests made, and caused 30,000 pens to be made up with the use of the imported articles. A small fraction of these pens was shipped to department stores. It later developed that the pens were faulty, with the result that every one sent out was ultimately returned. The fault was found to lie in the fact that the imported synthetic sapphire balls were not perfect spheres, were uneven, and not round, which caused the socket in which they traveled to assume an oblate or uneven shape, in turn causing leakage. In each case, the imported article was replaced by a steel ball.

In the brief filed on behalf of the plaintiff, it is argued (1) that the imported articles were not parts of fountain pens because they were not actually, practically, or commercially fit for such use, and (2) that in their imported condition they were, in fact, not ball points. In the brief filed on behalf of the defendant, it is pointed out that plaintiff's first argument as to actual, practical, or commercial fitness for use is, in essence, an argument that to be dutiable under the provision for parts of fountain pens, imported articles must be *suitable for use* as parts of fountain pens, and it is contended that the statute makes no such requirement.

We think the contention made by counsel for the defendant with respect to plaintiff's first argument has merit. Wherever Congress has made suitability for use the test of classification, it has used language expressive of that purpose, and the term "suitable" in such cases has been defined as meaning "actually, practically, and commercially fit." *United States* v. *Lorsch & Co.*, 8 Ct. Cust. Appls. 109, T. D. 37222, and cases therein cited. But Congress made no such test for the classification of parts of fountain pens, and we are not at liberty to adopt it as the determinant in this case.

We are satisfied, however, that the second argument advanced by the plaintiff, viz, that in their imported condition the synthetic sapphire balls were not, in fact, ball points, and consequently not parts of ball point fountain pens, is sound and is supported by the record evidence.

The general rule which obtains in the classification of imported merchandise is that it is classifiable according to its character and condition at the time of importation. *Worthington* v. *Robbins*, 139 U. S. 337. Exceptions to this rule are only those cases of express statutory provision otherwise (e. g., paragraphs 398 and 813, Tariff Act of 1930, prohibiting allowance for damage, etc., in certain circumstances), and where classification is, by statute, made dependent upon subsequent use (*Leonard Levin Co.* v. *United States*, 27 C. C. P. A. (Customs) 101, C. A. D. 69).

There is no question in connection with either of the competing tariff provisions in this case of a statutory requirement that the merchandise be classified in accordance with other than its imported condition, and, consequently, our inquiry must be whether, in their condition as imported, the synthetic sapphire balls before us were parts of fountain pens.

In approaching this question, we must distinguish between articles which in their imported condition are poor, or inefficient, parts of fountain pens, and articles which in their nature are not parts of fountain pens at all. The former would take classification under the provision for parts of fountain pens, while the latter, of course, would not.

The record shows that it is a requisite of a ball point pen that the ball point be perfectly spherical, and it also shows that the synthetic sapphire balls here involved were not perfectly spherical. It would seem to follow from this that the imported articles were not ball points and, consequently, not parts of ball point fountain pens.

It is, however, pointed out by counsel for the Government in the brief filed in its behalf that the imported articles were actually used in the production of ball point fountain pens, and that, since nothing had been done with the synthetic sapphire balls after importation except to insert them into the sockets at the tips of the pens, they must have been parts of ball point fountain pens in their imported condition.

There is no question but that this argument would have great weight if it were not further disclosed by the record that it was necessary to remove not only some, but *every* imported synthetic sapphire ball which had been inserted in the pens. This total failure of the imported articles to function as part of ball point pens demonstrates that they were not merely poor or low-grade ball points, but that they were not, in their nature, articles which had the character and condition of ball points.

Judgment will therefore issue sustaining the protest claim for duty at the rate of 30 per centum ad valorem under paragraph 214 accordingly.